UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| eChanging BARCODE, LLC,<br><br>                                    Plaintiff,<br><br>                    -v-<br><br>MLB ADVANCED MEDIA L.P.,<br><br>                                    Defendant. | 24 Civ. 2930 (PAE)<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a claim of patent infringement on the ground that the patent covers ineligible subject matter. Plaintiff eChanging Barcode, LLC ("eChanging") is the sole patentholder of U.S. Patent No. 9,047,715 (the "'715 Patent"). The patent, titled "System and Method for Credential Management and Administration," describes an invention aimed at combatting fraud in the event ticketing industry. It claims a method of "dynamic barcoding" technology that generates and rotates electronic access credentials in a manner aimed at preventing sales of tickets that are counterfeit or unauthorized for resale.

In this lawsuit, eChanging alleges that the "Protect the Barcode" technology of defendant MLB Advanced Media L.P. ("MLBAM") is similarly comprised of a rotating digital barcode and thus infringes on the '715 Patent. eChanging seeks damages and injunctive relief under 35 U.S.C. § 271 for such infringement. Pending now is MLBAM's motion to dismiss eChanging's Amended Complaint ("AC") under Federal Rule of Civil Procedure 12(b)(6) on the ground that the patent covers subject matter that, under 35 U.S.C. § 101, is ineligible for patent protection. Dkt. 57. For the reasons that follow, the Court denies the motion.

1

## I.    Background[1]

### A.    The Parties

eChanging is a Delaware limited liability corporation partly owned by Alan Amron, a "lifelong inventor" to whom 40 patents have been awarded. AC ¶ 2.

MLBAM is a limited liability partnership owned by the 30 Major League Baseball club owners. *Id.* ¶ 3. It is based in New York City. *Id.* MLBAM manages online and interactive marketing for MLB, and controls and operates digital ticketing platforms for its member-team corporations. *Id.*

### B.    The '715 Patent

eChanging's '715 Patent, titled "System and Method for Credential Management and Administration," was issued by the U.S. Patent and Trademark Office on June 2, 2025. *Id.* ¶ 9. eChanging describes it as a tool to combat online ticketing fraud and as "innovative technology" directed at eliminating unauthorized duplication and resale of counterfeit event tickets. *Id.* ¶ 16. On April 26, 2024, Amron transferred the ownership rights to the patent to eChanging. Dkt. 56.

eChanging pleads that prior ticketing technology had relied on "static tickets vulnerable to unauthorized duplication made possible by scanners, printers, and radio-frequency ID ('RFID') tags," AC ¶ 17. By contrast, it pleads, its "pioneering" technology improves existing credential management systems by using (1) dynamic, rotating access credentials; (2) an association of portable electronic devices, identifiable by unique identifiers, with the credential administration server; (3) dynamic visual symbol management location- and time-based access restrictions; and (4) specific configurations for displaying the rotating access credentials issued

---

[1] The following facts, assumed true for purposes of resolving the motion, *see Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024), are drawn from the Amended Complaint ("AC"), Dkt. 41, and annexed exhibits.

by the credential administration server. *Id.*; *see also* Dkt. 59 ("Pl. Br.") at 12. In other words,

"[u]nlike static credentials, which have a fixed representation and can be easily copied or

scanned, the rotating credentials of the '715 Patent update periodically, *i.e.*, every 30–6,000

seconds." AC ¶ 23.

The first claim in the '715 Patent describes the technology as follows:

A non[-]transitory computer-readable storage medium encoded with computer-executable instructions which, when executed by a processor, perform a method for configuring a portable electronic device as part of a credential management System, comprising:

associating at a credential administration server, a first portable electronic device, identifiable by a unique identifier, with a first user and at least one of a location or a service Subject to access restrictions;

obtaining first visual symbol information, at the credential administration server, for use by the first portable electronic device initiating display of a first machine discernable image to be presented as an access credential by the first user during a first specified time interval, the first time interval being specified to have a duration of between 30 to 6000 seconds;

for visible display of the first machine discernable image by the first portable device during the first time interval, initiating wireless transmission of the obtained first visual symbol information to the first portable electronic device;

obtaining second visual symbol information, at the credential administration server, for use by the first portable electronic device in initiating display of a second machine discernable image to be presented as an access credential by the first user during a second specified time interval, the second time interval being specified to have a duration of between 30 to 6000 seconds; and

for visible display of the second machine discernable image by the first portable electronic device upon expiration of the first time interval, initiating wireless trans mission of the obtained second visual symbol information to the first portable electronic device.

AC, Ex. A at 10–11.

Subsequent claims recite the mechanics of eChanging's claimed invention. For example:

- Claims 2–8 and 17–19 recite the method by which a user's "unique identifier," *i.e.*, a "rotating barcode," is "locally generate[d]" and "associate[d]" with a portable electronic device. *Id.* at 11–13; *see also* AC ¶ 20. This "visual symbol information" is subject to "specified time interval[s], . . . being specified to have a duration of between 30 to 6000 seconds." *Id.* The process facilitates "display of a respectively different bar code by each portable electronic device during each corresponding time interval." *Id.* at 13.

- Claims 9–13 recite the process by which the "computer-readable storage medium . . . further perform[s]" receiving, storing, and transmission of data unique to the user and to the "areas of a facility to which the . . . user is authorized for entry during an event." *Id.* at 11–12.

- Claims 14–16 and 19 recite the process by which the unique identifiers are then "associate[d]" with a credential administration server, subject to location restrictions. *Id.* at 12–13.

- Claims 32–34 recite the process by which a user's unique credentials are authenticated by the credential administration server. *See id.* at 15.

- Claims 35–38 recite the method by which the credential administration server may "reject[]" a candidate portable electronic device if its "received data is not representative of a visual symbol valid during a current time interval and associated with any authorized user"; *i.e.*, when the record associated with the user does not reflect the "time, date, location, and event" pre-authorized for entry. *Id.*

The AC alleges that the '715 Patent's dynamic barcode method "technically improve[s] credential management systems" by providing "significant advantages over prior art (static)

ticketing systems, specifically improving security for events, premises, and access credentials." *Id.* ¶¶ 22, 25. Because the '715 Patent's credentials rotate periodically, eChanging alleges, it is "impossible for anyone to use a screenshot or a printout of the credential to access a service or a product," in contrast to static credentials, which are susceptible to counterfeiting or duplication. *Id.* ¶ 23.

### C.    MLBAM's Allegedly Infringing "Protect the Barcode" Technology

eChanging's AC accuses MLBAM of infringing on the '715 Patent by use of its "Protect the Barcode" technology. It alleges that MLBAM maintains a server that enables ticketholders and buyers to use the "MLB Ballpark App," an application MLBAM created and has made available to users of iOS and Android devices. *Id.* ¶ 26. The MLB Ballpark App permits users to manage digital tickets. *See id.* Salient here, MLBAM advertised the launch of its "Protect the Barcode technology," which "update[s] the digital barcode displayed on your ticket from a static one to a rotating one that cannot be duplicated." *Id.* ¶ 32.

The AC describes MLBAM's two-step ticketing process, as administered through its MLB Ballpark App and using the Protect the Barcode technology, as follows. First, after a ticket is purchased through the App, a user "will obtain a first visual symbol information for transmission to and visual display on the portable electronic device running the app." *Id.* ¶ 31. Second, the "portable electronic device will display the first symbol during a first specified time interval [in] order to gain access to the ballpark and the purchased seats (i.e., entry into the game)." *Id.* The dynamic barcode "rotate[s] every few seconds and will display animated baseballs along the flanks of the ticket." *Id.* ¶ 27. It is also subject to location- and time-based access restrictions. *Id.* ¶ 30. In short, "a first barcode symbol of rotating access credential will be obtained by MBLAM servers, and/or those of its ticketing partners, transmitted, and

presented/displayed on the portable electronic device running the MLB Ballpark App, such that a user can be permitted appropriate entry into the game." *Id.* ¶ 31. MLBAM's website holds out its "new, rotating barcode" as designed to "protect [ballpark users] from counterfeiting and fraud," and to afford greater security throughout the ticketing process. *Id.* ¶¶ 32, 36.

The AC alleges that MLBAM's system of rotating barcode access credentials infringes upon the scope of the '715 Patent claims. Specifically, the AC alleges that the MLBAM technology, like the '715 Patent, (1) associates a unique identifier that links the user's portable electronic device with the service in which the tickets provide access; (2) subjects the user to location- and time-based access restrictions, (3) displays a "machine discernable image" consisting of a consists of a "barcode symbol of rotating access credential[s]," (4) wirelessly transmits authentication information between the server and the user's mobile device, and (5) renders "unusable" the use of "screenshots" or other static barcodes, and that such infringes upon the claimed '715 Patent technology. *Id.* ¶ 35.

### D. Procedural History

On April 16, 2024, Amron, individually, filed the Complaint against MLBAM, claiming patent infringement. Dkt. 1. On June 15, 2024, Amron moved to amend to substitute eChanging as plaintiff. Dkt. 14. On July 17, 2024, MLBAM moved to dismiss. Dkts. 27–28. On July 18, 2024, the Court issued an order directing Amron to incorporate its substitution request, and any other proposed amendments, into an amended complaint filed pursuant to Rule 15(a)(l)(B). Dkt. 30. On August 7, 2024, eChanging filed the AC. *See* Dkt. 41. On August 20, 2024, MLBAM moved to strike, principally contending that because eChanging had not yet been substituted as a plaintiff, it was improper for it to file the AC. Dkts. 42–43. On August 30, 2024 eChanging opposed. Dkt. 48. On September 6, 2024, MLBAM replied. Dkt. 49. On October

21, 2024, MLBAM moved for sanctions on ground that Amron and eChanging lacked valid

ownership rights to the patent. Dkts. 50–51. On November 4, 2024, eChanging opposed. Dkt.

54. On November 12, 2024, MLBAM replied. Dkt. 55.

On December 6, 2024, the Court issued a decision. Dkt. 56. It permitted the substitution

of eChanging as plaintiff, *id.* at 3–4 ("A change in parties to reflect the reassignment of patent

ownership is within the scope of the circumstances in which Rule 25(c) permits substitution."

(collecting cases)), and denied MLBAM's motions to strike and for sanctions.

On January 6, 2025, MLBAM filed the instant motion to dismiss. Dkt. 57. It argues that

the '715 Patent is invalid under § 101 insofar as it covers ineligible subject matter. Dkt. 58

("Def. Br."). On January 27, 2025, eChanging opposed. Dkt. 59. On February 10, 2025,

MLBAM replied. Dkt. 60.

## II. Applicable Legal Standards

### A. Standards Governing Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim is facially plausible where "the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558. A court must assume all well-pled facts to be

true, drawing all reasonable inferences in favor of the plaintiff. *See Apotex Inc. v. Acorda

Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016). Where a complaint pleads facts that are

"merely consistent with" a defendant's liability, it "stops short of the line between possibility and

plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (cleaned up). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (cleaned up) (quoting *Twombly*, 550 U.S. at 557).

On a Rule 12(b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). Applying these principles, the Court here considers the '715 Patent registration with the United States Patent and Trademark Office, annexed as Exhibit A to the AC. *See* Dkt. 41-1.

**B.    Standards Governing Patent Eligibility**

"Whether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry." *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008) ("*Bilski I*"), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010) ("*Bilski II*"). Where a claim is not so drawn, it "must be rejected even if it meets all of the other legal requirements of patentability." *Id.*

Whether a claim is drawn to patent-eligible subject matter presents a "pure question of law." *Lumen View Tech. v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 204 (S.D.N.Y. 2013); *see also Bilski I*, 545 F.3d at 951 (patent validity under § 101 is an "issue of law"). The Patent Act provides that all patents are "presumed valid," and that "[e]ach claim of a patent (whether independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims[.]" 35 U.S.C. § 282(a). In light of the presumption of validity, "[t]he party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence." *Lumen View*, 984 F. Supp. 2d at 194; *see also* 35 U.S.C. § 282(a) ("The

8

burden of establishing invalidity of a patent or any claim thereof . . . rest[s] on the party asserting

such invalidity.").

Section 101 of the Patent Act sets out the categories of inventions that are eligible for

patent protection.  It provides:

> Whoever invents or discovers any new and useful process, machine, manufacture,
> or composition of matter, or any new and useful improvement thereof, may obtain
> a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101.  The Supreme Court has held there are "three specific exceptions to § 101's

broad patent-eligibility principles: 'laws of nature, natural phenomena, and abstract ideas.'"

*Bilski II*, 561 U.S. at 601 (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)).  The

Court has explained that, although these exceptions are not recited in the text of § 101, they

follow from the foundational principle that "a patentable process must be 'new and useful.'"  *Id.*

at 602.

The Supreme Court most recently applied these concepts in its 2014 decision in *Alice*

*Corporation v. CLS Bank International*, where it explained that excluding "laws of nature,

physical phenomena, and abstract ideas" from § 101 is necessary to avoid deterring innovative

work.  573 U.S. 208, 216 (2014).  "Laws of nature, natural phenomena, and abstract ideas are the

basic tools of scientific and technological work," the Court reasoned, and "monopolization of

those tools through the grant of a patent might tend to impede innovation more than it would

tend to promote it, thereby thwarting the primary object of the patent laws."  *Id.* (cleaned up).  As

the Court has illustrated the point:  "[A] new mineral discovered in the earth or a new plant

found in the wild is not patentable subject matter.  Likewise, Einstein could not patent his

celebrated law that $E = mc^2$; nor could Newton have patented the law of gravity.  Such

discoveries are manifestations of . . . nature, free to all men and reserved exclusively to none."
*Chakrabarty*, 447 U.S. at 309 (citation omitted).

The Court has recognized, however, that "too broad an interpretation of this exclusionary
principle could eviscerate patent law." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
566 U.S. 66, 71 (2012). "Thus, an invention is not rendered ineligible for [a] patent simply
because it involves an abstract concept." *Alice*, 573 U.S. at 217. Rather, a court applying § 101
"must distinguish between patents that claim the building blocks of human ingenuity and those
that integrate the building blocks into something more, thereby transforming them into a patent-
eligible invention." *Id.* (cleaned up).

A two-step framework guides the § 101 inquiry. *See id.* at 217–18; *Mayo*, 566 U.S. at
77–80. First, a court considers whether "the claims at issue are directed to one of [the] patent-
ineligible concepts." *Alice*, 573 U.S. at 217. At this step, "[t]he claims are considered in their
entirety to ascertain whether their character as a whole is directed to excluded subject matter."
*Univ. Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346 (Fed. Cir. 2021) (citation omitted).
The Court has declined "to delimit the precise contours of the 'abstract ideas' category." *Alice*,
573 U.S. at 221. Instead, its parameters are derived from a "detailed consideration of the
controlling precedents." *Mayo*, 566 U.S. at 80.

Addressing the first step, the Supreme Court in *Alice* noted that courts have recognized as
outside the scope of § 101 patents covering various categories of abstract ideas, such as
"method[s] of organizing human activity," 573 U.S. at 220, or "fundamental economic
practice[s] long prevalent in our system of commerce," *id.* at 219. Neither in *Alice* nor its prior
cases applying § 101, however, did the Court articulate a rule to determine what constitutes an
abstract idea within the meaning of step one. Instead, the Court—and the Federal Circuit—have

generally proceeded by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed Cir. 2016); *see also Intell. Ventures LLC v. Cap. One Bank*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) ("The abstract idea here is not meaningfully different from the ideas found to be abstract in other cases before the Supreme Court and [the Federal Circuit].").

At the second step of *Alice*, a court inquires whether the patent contains an "inventive concept" that transforms the claimed invention into one that is patent-eligible. *Alice*, 573 U.S. at 217 (citation omitted). As the Supreme Court framed that inquiry in *Alice,* "[W]e then ask, 'what else is there in the claims before us?'" *Id.* at 217. A court carrying out that inquiry considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79). Put differently, the Court "search[es] for . . . something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Mayo*, 566 U.S. at 77). Courts conducting this inquiry have sustained patents on the ground that, independent of whether an abstract idea is implicated, the invention described claimed much more than that. *See, e.g.*, *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098–99 (Fed. Cir. 2021); *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016).

A patent thus survives review under § 101 if it satisfies either step of the *Alice* inquiry. *See Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 136 (Fed. Cir. 2022) (sustaining patent claims under *Alice* step two alone); *CosmoKey*, 15 F.4th at 1097 (same); *Openet Telecom,*

*Inc.*, 841 F.3d at 1300 (same); *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1371 (Fed. Cir. 2020) (same, under *Alice* step one).

## III.    Discussion

MLBAM argues that the claims at issue are drawn to patent-ineligible subject matter and fail at both steps of the *Alice* analysis. The Court, finding it plausible that the claimed invention is directed to a non-abstract idea and includes an inventive concept, cannot so find at the pleadings stage. The Court accordingly denies the motion, without prejudice to MLBAM's right, later in the litigation, to challenge the patent under § 101. *See, e.g.*, *Coop. Ent.*, 50 F.4th at 136 ("We do not decide today that the claims are patent eligible under § 101. We hold only that there are plausible factual allegations that the claims include inventive concepts, and that is enough to preclude dismissal."); *Personalized Media Commc'ns, LLC v. Netflix Inc.*, 475 F. Supp. 3d 289, 300, 308 (S.D.N.Y. 2020) ("The Court's decision [to sustain the patent] is narrow because it must accept as true the allegations in [plaintiff's] complaint. It does not preclude [defendant] from challenging these patents under Section 101 on summary judgment and at later stages of this case."). The Court's analysis at the successive *Alice* steps is as follows.

### A.    *Alice* Step One

At the first step, the Court considers "whether the claims at issue are directed to a patent-ineligible concept," which includes "abstract ideas." *Alice*, 573 U.S. at 217 (cleaned up). Abstract ideas include, *inter alia*, "established business practice[s]" and "method[s] for organizing human activity," which has been construed by the Federal Circuit to include the process of "credentialing visitors and checking them in and out of an access-controlled environment." *Repifi Vendor Logistics, Inc. v. IntelliCentrics, Inc.*, No. 2021-1906, 2022 WL 794981, at *2 (Fed. Cir. Mar. 15, 2022) (citation omitted). Relying on *Repifi*, MLBAM argues

that the claims in the '715 Patent are directed towards "the unpatentable abstract idea of controlling access using changing credentials." Def. Br. at 5–13. eChanging, by contrast, defends the patent on the ground that MLBAM characterizes the claims at too high a level of abstraction, untethered from the language of the claims. *See* Pl. Br. at 7–8 (citing *Enfish*, 822 F.3d at 1337); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed Cir. 2016) ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." (quoting *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016))).

MLBAM's characterization of the patent claims fails because it is pitched at far too high a level of abstraction. *See Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981) (cautioning against overgeneralization of patent claims). As eChanging notes, MLBAM's caricature of the '715 Patent ignores "the *how*"—the specific method by which the server in its credential management system would dynamically generate and manage access credentials. Pl. Br. at 3 (emphasis in original). Rather, the patent's claims delineate steps that sequentially "associat[e] the device with a unique identifier, user, and access restrictions"; "obtain visual symbol information to generate machine-discernable images for access credentials"; and "initiat[e] the wireless transition of visual symbol information to the device within specified time intervals." *Id.* In light of these limitations, MLBAM oversimplifies in claiming that the patent captures only the quotidian idea of "controlling access using changing credentials." Def. Br. at 5. Contrary to this reductivist portrayal, on the pleadings, the '715 Patent is far afield from the patents that courts have held to be directed at ideas so abstract and universal as to be patent-ineligible.

This Court's decisions under § 101 supply a useful contrast. Applying *Alice*, this Court has three times held patents invalid under § 101 on the ground that they covered unpatentable

abstract ideas. *See Realtime Tracker, Inc. v. RELX, Inc.*, 659 F. Supp. 3d 384, 406 (S.D.N.Y. 2023) (patented billable timekeeping system directed at "the abstract idea of timekeeping"), *aff'd*, No. 2023-1756, 2024 WL 4746162 (Fed. Cir. Nov. 12, 2024); *Quantum Stream Inc. v. Charter Commc'ns, Inc.*, 309 F. Supp. 3d 171, 186 (S.D.N.Y. 2018) (same, as to attempt to patent the "familiar and unremarkable process" of targeted advertising); *DietGoal Innovations LLC v. Bravo Media LLC*, 33 F. Supp. 3d 271, 284 (S.D.N.Y. 2014) (same, as to attempt to patent the "well known" process of dietary analysis and meal planning). The claims of the '715 Patent, which describe a technologically complex, dynamic, and cyber-enabled method of changing access credentials, are facially less abstract and quotidian than those in *Realtime Tracker*, *Quantum Stream*, and *DietGoal*, or the case law upon which they drew. On the pleadings, the '715 Patent is plausibly read to go well beyond merely credentialing visitors, as MLBAM asserts. *See, e.g.*, *Finjan*, 879 F.3d at 1304 ("Our cases confirm that software-based innovations can make non-abstract improvements to computer technology and be deemed patent-eligible subject matter at step 1." (citation omitted)); *CardioNet*, 955 F.3d at 1370 (claims non-abstract where "directed to a specific technological improvement"); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017) (claims non-abstract where "directed to an improved computer memory system, not to the abstract idea of categorical data storage"); *Enfish*, 822 F.3d at 1336 (claims non-abstract where focused on "an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity").

**B.    *Alice* Step Two**

In any event, even if the '715 Patent's claims were found to be pitched to an abstract idea such as credentialing visitors, dismissal would still be unwarranted if the patent satisfies *Alice*

step two.  *See Openet Telecom*, 841 F.3d at 1303 ("Even if we were to agree that claim 1 is

directed to an ineligible abstract idea under step one, the claim is eligible under step two because

it contains a sufficient 'inventive concept'" under *Alice* step two); *CosmoKey*, 15 F.4th at 1097

(same); *Coop. Ent.*, 50 F.4th at 136 (same).  Such is the case here.

At step two, the Court considers "the elements of each claim both individually and as an

ordered combination to determine whether the additional elements transform the nature of the

claim into a patent-eligible application." *Alice*, 573 U.S. at 217 (citing *Mayo*, 566 U.S. at 77–

78).  MLBAM argues that the claims at issue lack an "innovative concept" that transforms the

abstract idea of credential management into a patent-eligible application.  Def. Br. at 13–15.

eChanging counters that the dynamic barcode technology that the patent describes constitutes a

"technological improvement" over traditional methods of credential management and provides

"a specific technological solution that enhances security in a central management."  Pl. Br. at 13.

On the review that is appropriate at the pleadings stage, eChanging is correct.

In considering software-based inventions, the Supreme Court has held that the claimed

invention must do more than "well-understood, routine, conventional activities previously known

to the industry." *Alice*, 573 U.S. at 223 (cleaned up).  In addition, "[a]n inventive concept that

transforms the abstract idea into a patent-eligible invention must be significantly more than the

abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea

on a computer." *BASCOM*, 827 F.3d at 1349 (citing *Alice*, 573 U.S. at 222–23); *see also*

*Universal Secure Registry*, 10 F.4th at 1346 ("[P]atent eligibility often turns on whether the

claims provide sufficient specificity to constitute an improvement to computer functionality itself.").

Applying this teaching, the Federal Circuit has distinguished patent-*ineligible* innovations that merely automate conventional processes from patent-*eligible* innovations that improve upon them. *See CosmoKey*, 15 F.4th at 1096 (contrasting claims aimed at automating "conventional" techniques with claims "directed to specific . . . methods that depart from earlier approaches and improve computer technology"). *Compare Universal Secure Registry*, 10 F.4th at 1357 (patent-ineligible where "the claimed invention merely combines conventional authentication techniques"), *and Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) (patent-ineligible where "the asserted claims cite well known and conventional ways to allow generic communication between a sender and recipient using generic computer technology"), *with CosmoKey*, 15 F.4th at 1098 (patent-eligible where claimed method "recite[s] a specific improvement to authentication that increases security, prevents unauthorized access by a third party [and] is easily implemented"), *and Finjan*, 879 F.3d at 1304 (patent-eligible where claimed method, a security system that identified *potentially* hostile viruses, "does a good deal more" than the traditional approach, which located only *previously identified* viruses).

Here, on the facts pled, including the terms of the patent itself, the '715 Patent improves upon traditional credentialing methods. It claims a distinct method for dynamically generating and managing access rotating access credentials. eChanging's "pioneering" rotating barcode technology, as discussed above, improves upon conventional static ticketing methods by (1) generating dynamic, rotating access credentials; (2) associating portable electronic devices, identifiable by unique identifiers subject to location- and time-based access restrictions; (3) offering dynamic visual symbol management at the credential administration server; and

(4) supplying specific configurations for displaying the rotating access credentials set forth by the credential administration server. AC ¶ 17; *see also* Pl. Br. at 12. Far from "recit[ing] no more than the sort of perfectly conventional" static approach to ticketing, *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1018 (Fed. Cir. 2017), the '715 Patent's "dynamic" ticketing method, as pled, involves steps aimed at generating and authenticating a revolving digital barcode. *See* AC ¶ 17; Pl. Br. at 3. This "dynamic" method "provides significant advantages" over a static method insofar as it is "directed to specific technological improvements in a credential management system." AC ¶¶ 22, 40; Pl. Br. at 3. In lay terms, the claimed invention, in part due to the dynamically changing digital barcode, stands to be far more effective than conventional electronic ticketing safeguards in combatting ticket fraud, counterfeiting, duplication, and scalping. *See* AC ¶ 23; *see also Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024) (patent may be eligible where it articulates a "specific, technological solution to a technological problem"), *cert. denied*, No. 24-827, 2025 WL 1151241 (Apr. 21, 2025); *RDPA, LLC v. Geopath, Inc.*, 543 F. Supp. 3d 4, 19 (S.D.N.Y. 2021) (same).

The Federal Circuit's decision in *CosmoKey* supplies an instructive analog. 15 F.4th at 1091. At issue there was a patent, by now familiar to many, for authentication technology created by a company called Duo Security. *See id.* at 1095. The patent, titled "Authentication Method," recited a multi-step authentication method for web user log-ins that require verification of a user's identity using a mobile device. *Id.* at 1093. The patent purported to improve upon existing methods of authentication by pioneering a form of secured verification through a user's mobile device as opposed to relying upon conventional methods of authentication such as manual entry of information. *See id.* On a challenge to its validity, the Federal Circuit held that,

17

at *Alice* step two, the Duo authentication software contained a sufficiently "inventive concept" that it was patent-eligible. *Id.* at 1097. The patent's claims, the Circuit reasoned, "recite a *specific improvement* to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity." *Id.* at 1098 (emphasis added). It emphasized the "inventive nature" of the Duo patent claims, explaining that, compared to "conventional multifactor authentication systems," the patent "recite[s] an improved method" that "increases computer and network security, prevents a third party from fraudulently identifying itself as the user, and is easy to implement[.]" *Id.* at 1099. The claimed invention, the Circuit concluded, thus recited an inventive concept "by requiring a specific set of ordered steps that go beyond [an] abstract idea . . . and improve[s] upon the prior art by providing a simple method that yields higher security." *Id.*

On the basis of the pleadings, the dynamic barcode method similarly offers a notable and specific technical improvement over conventional methods. The claims recite a distinct method of generating and authenticating rotating barcodes that, like the Duo authentication technology, is inventive and provides concrete advantages over existing methods. Far from lacking "any inventive concept to the abstract idea of controlling access using changing credentials," Def. Br. at 14, eChanging's pleadings plausibly term its rotating barcode technology as "pioneering" in the field of digital ticketing, and as a "concrete technological advance in the field of secure credential management systems." AC ¶ 17; Pl. Br. at 4. There are thus "plausible factual

allegations that the claims include inventive concepts," and "that is enough to preclude dismissal." *Coop. Ent.*, 50 F.4th at 136.

*Repifi Vendor Logistics*, *supra*, on which MLBAM relies, is not to the contrary. That case involved a patent for technology for automated credentialing processes in "access-controlled environments like hospitals, health care facilities, office buildings, and the like." 2022 WL 794981, at *1. Where conventional methods for managing visitor access "involved manned reception desks at which a receptionist could verify a visitor's identity and issue a temporary, limited-use paper identification badge," the claimed method offered a "smartphone-based credentialing platform" that assigned entrants an electronic badge that limited visitor access to specific time intervals and at specific locations. *See id.* In its unpublished opinion, however, the Federal Circuit held, at *Alice* step two, that claimed method of automated entry was not sufficiently inventive. *See id.* at *2. It noted that "none of the claim limitations are directed to improvements that enable the badge to change its display in real time or communicate with a smart phone. Instead, the claims merely recite the use of conventional abilities of a conventional electronic badge." *Id.* at *3. Thus, the claimed invention did no more than propose to automate the existing credentialing process—"and precedent makes clear that automation of a long-standing human process cannot be the inventive concept." *Id.* (cleaned up).

MLBAM here argues that *Repifi* compels the same result. But unlike the patent at issue there, the '715 Patent, as pled, does more than automate a conventional process. It does not merely, for example, supply a computerized method of entering access-restricted facilities. *See Secured Mail*, 873 F.3d 905 at 911 ("Merely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention." (citation omitted)). Rather, in the manner reviewed above, it improves upon

(and plausibly reinvents) existing credentialing processes through use of dynamic barcode technology, a specific technological improvement to the ticketing process designed to, unlike static barcodes, prevent unauthorized duplication or counterfeiting of credentials. *See* AC ¶ 15; *accord CosmoKey*, 15 F.4th at 1097. As pled, eChanging's revolving barcode technology sufficiently improves upon existing methods of controlling access credentials and thus survives *Alice* step two. *See Finjan*, 879 F.3d at 1304 (patent-eligible under *Alice* step one where the claimed method "does a good deal more" than conventional methods); *Enfish*, 822 F.3d at 1338 (same where claims "are directed to an improvement in the functioning" of existing computer software); *McRO*, 837 F.3d at 1316 (same where "[t]he claim uses the limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice").

The Court therefore denies MLBAM's motion to dismiss without prejudice to MLBAM's ability to dispute patent eligibility at later stages of this litigation.

## CONCLUSION

For the foregoing reasons, the Court denies MLBAM's motion to dismiss the Amended Complaint. The Court will by separate order schedule an initial telephonic conference with the parties. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 57.

SO ORDERED.

*Paul A. Engelmayer*

_____
Paul A. Engelmayer
United States District Judge

Dated: May 30, 2025
      New York, New York